**\*\* NOT FOR PUBLICATION \*\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LABORERS' LOCAL UNION NOS. 472 & 172 AND LABORERS' LOCAL UNION NOS. 472 & 172 WELFARE AND PENSION FUNDS AND SAFETY, EDUCATION AND TRAINING FUNDS; ZAZZALI, FAGELLA, NOWAK, KLEINBAUM & FREIDMAN, P.A. : : : : : : : | | |
| Petitioners, : | Civil Action No. 12-7119 | |
| v.  : | **OPINION** | |
| BUCKLER ASSOCIATES, INC.  : | | |
| Respondent.  : | | |

**WOLFSON, United States District Judge:**

Laborers Local Union No. 472 & 172 ("Union") and Heavy and General Laborers Funds of New Jersey ("Funds") (collectively "Petitioners") initiated this action against Buckler Associates, Inc. ("Employer" and "Respondent") to enforce a labor arbitration award obtained against Buckler under the terms of a collective bargaining agreement ("CBA"). That agreement required Buckler to assume liability for delinquent contributions owed to the Funds. Presently before the Court is Petitioners' petition to confirm the arbitration award. For the reasons set forth below, the Court confirms the arbitration award in the amount of $157,278.46.

1

I.         FACTUAL BACKGROUND AND PROCEDURAL HISTORY.

        A.         The Arbitration Record

The instant matter concerns an arbitration award ("Award") issued by designated arbitrator J. J. Pierson, Esq. ("Pierson") on September 29, 2012 (corrected October 23, 2012). (Pet'rs' Ex. B., p.1). The parties, Laborers Local Union No. 472 & 172 ("Union") and Heavy and General Laborers Funds of New Jersey ("Funds") (collectively "Petitioners") and Buckler Associates, Inc. ("Employer" and "Respondent") are signatories to a Collective Bargaining Agreement ("CBA")[1]. (*Id.* at p.10). Pursuant to that agreement, the parties entered into arbitration after the Employer failed to remit employee benefit contributions for work performed by the Funds' employees on Union construction projects and the Employer failed to submit to an inspection of the payroll records by the Funds, pursuant to Article 33 of the Agreement. (*Id.* at p. 1). Arbitrator Pierson conducted hearings on June 7, 2012 and August 30, 2012. (*Id.*)

At the hearing, the Funds contended that the Employer refused to make documents available during a prior audit, which resulted in the audit's incompleteness, and further contended that, in the audit, the Employer misrepresented hours worked by the bargaining unit laborers, under-reported the hours of work performed by the bargaining unit employees, and failed to remit benefit contributions for all hours worked by laborers. (*Id.*) The Funds asserted that the Employer was given ample opportunity to correct the auditor's findings by submitting payroll documents, but that the Employer failed to do so. (*Id.*) Therefore, the Funds initially sought $82,338.22 in delinquent contributions, plus interest, attorney's fees, liquidated damages and the cost of arbitration

---

[1] The parties are signatories as determined by the arbitrator. *See infra, section I-B.*

2

and requested an Order to produce W-2's and certified payrolls previously sought in the audit. (*Id*.)

In response to the Funds' allegations, the Employer challenged the validity of the CBA, and by extension, the audits that stemmed from it, maintaining that the signature on the agreement was "forged" and was not the signature of the Employer's principal officer. (*Id*. at p. 3). The Employer's principal officer, Bert Buckler ("Buckler") stated that he was "not a union company," and never spoke to Glenn Kenyon ("Kenyon"), the representative of the Funds. (*Id*.) He also stated that the payroll records included employees "not doing cement work" and non-union employees performing work on other projects. (*Id*.) Importantly, however, the Employer recognized that it employed individuals who were indeed union members, and while it asserted that no contributions were due, it nevertheless consented to the arbitration. (*Id*.)

Following the hearing, Pierson issued an opinion. He presented the "relevant contract language" from the CBA as follows:

Article 33 – Welfare Fund:

a) In accordance with the Agreement and Declaration of Trust dated July 1, 1950, as amended and supplemented, each Employer, whether or not a member of the Utility and Transportation Contractors Association of New Jersey, agrees to make payments upon a weekly basis in accordance with the rates and effective dates as set forth in Article 18 here of [sic] for each employee covered by this agreement, to the "Heavy and General Laborers' Welfare Fund of New Jersey", hereinafter called the Fund, established by said Agreement and Declaration of Trust (Incorporated by reference herein).

f) The Employers agree that the Trustees of the Fund shall have the right to require such reports by the employers as are necessary to the fulfillment of the Agreement and Declaration of Trust and the contracts of insurance. The Trustees and any insurer shall have the right to inspect, at all reasonable times, the employment, payroll and other such records of each Employer as are pertinent to questions of accuracy or comprehensiveness of the reports of the Employer.

Article 38 – Collection Costs:

a) Any Employer delinquent in payment of contributions to or filing of reports with regard to any of the funds established herein shall pay reasonable attorney's fees of no less than 20% of the amount due when legal services are required to collect such indebtedness, together with any costs and interest thereon. Notwithstanding any other provisions of this Agreement, the Employer shall be required to pay the fee of the arbitrator when arbitration is required, and shall also be required to pay all auditing costs where the Employer has failed to grant an audit appointment, or failed to supply the auditor with all of the requested records, or otherwise failed to fully cooperate with the Fund's auditors.

The employer shall also be required to pay all three auditing costs in any instance where he disputes the amount claimed due to the Funds and he is re-audited, except where the re-audit shows that the Employer did not owe the Funds on the contributions for the period in question . . .

Article 39 – Fund Arbitration:

In the event that the Union, an Employer or the Fund's Trustees allege any dispute, violation or grievance concerning any provision of Article 32 through Article 38 or any provision of Article 17, the dispute, grievance or violation including disputes over delinquencies, shall be submitted to the permanent arbitrator or arbitrators established by the Employer and Employee Trustees of the aforesaid funds for resolution and binding decision. The submission of any said dispute, grievance or violation to the permanent arbitrator or arbitrators shall be in addition to, and not in lieu of or a waiver of, the Union's right to take economic action under Article 17 and/or its right to sue for specific performance of the contract. Any dispute in connection with the arbitrability of an[y] matter shall be resolved by the arbitrator.

(*Id*. at p. 3-4).

During the arbitration, the Funds introduced various documents, including the CBA, the signature page of the CBA executed by "Pablo Z. R," the signature page executed by Bert Buckler, the payroll report signed by Bert Buckler, and a payroll inspection letter. Moreover, the Funds introduced an initial audit report of Buckler Associates dated Oct. 21, 2011, an audit report of Buckler Associates dated May 10, 2012, Buckler Associates paystubs for "Jao E. Montiero," and two from Jose A. Perreira, along with further documentation of the Employer's payroll history. Most notably, the

4

Funds introduced a letter from Edward O'Hare, Esq.—Petitioners' attorney—to Pierson on June 7, 2012, detailing the problems involved with the Fund's incomplete audit. (*Id*. at 4-7).

The Employer, by contrast, merely submitted an affidavit from Bert Buckler, dated March 13, 2012, with two attachments: the signature page of the CBA and "exemplars" of Bert Buckler's signature used in order to assert that the signature on the CBA was not his. (*Id*. at 7).

Additionally, the Funds presented testimony from their 15-year Collections Manager Glenn Kenyon ("Kenyon"), who identified the Funds' exhibits, confirmed the contribution obligations by the Employer, and described the audit process. (*Id*. at 8). He testified that the Employer was aware that it was obligated to pay contributions through the CBA's rate sheet and through forms sent to the Employer's office. (*Id*.) Kenyon then identified Buckler, and testified that he spoke with Buckler "10 times during the course of the years . . . regarding benefits being owed, arbitrations being scheduled and judgments owed." (*Id*.) Kenyon stated that Buckler "never" told him or otherwise indicated that the Employer did not have a valid CBA, that the signatory page contained a false signature, or that he believed he was not required to pay contributions. (*Id*.) In fact, Kenyon stated that the Employer indeed forwarded contribution reports and submitted checks to the Funds for the period of April 4, 2010-May 26, 2010, and that other checks remained on file. (*Id*.)

As to the initial audit that remained incomplete, Kenyon testified that he forwarded a standard-form letter to Buckler to schedule an audit in September 2011. (*Id*.) The letter requested specific documents related to the audit. (*Id*. at 8-9). According to

5

Kenyon, when the audit was performed, it could not be completed because the Employer failed to make available "payroll records, quarterly reports and W2s." (*Id*. at 9). Only "[s]ome certified payrolls" were provided by the Employer. (*Id*.) During this first audit, it was determined that the Employer owed $35,000 in benefit contributions. (*Id*.)

At a later date, Kenyon testified that employees came forward with pay stubs showing that the Employer did not pay their benefits, and copies were sent to the Employer. (*Id*). It was then determined by the Funds that the Employer owed $82,338.44. (*Id*.) Kenyon stated that another letter was sent to the Employer giving it an opportunity to "submit the appropriate documentation" to correct any requests for benefits. (*Id*.) Kenyon testified that he received no response from the Employer. (*Id*.)

During the initial cross-examination of Kenyon, he was asked whether the signature on the signatory page of the CBA was Buckler's. (*Id*.) He responded that he had "no idea" but acknowledged that Buckler had submitted an affidavit that the signature was not his. (*Id*.) Additionally, when asked whether the revised amount owed in contributions was available, Kenyon responded that he had indeed forwarded the demand letter to the Employer and offered to review such documents. (*Id*.)

At this point in the arbitration, Buckler requested to be heard by Pierson. (*Id*.) He stated that his place of business and home address was 182 Wykoff Way West, East Brunswick, New Jersey. (*Id*.) He denied ever having an audit performed at that location, and was unaware of the employees listed in the letter resulting from the first, incomplete audit. (*Id*.) He did state that he retained a superintendent for the payroll records: Hugo Fernandez. (*Id*.)

6

At the second hearing on August 30, 2012, Kenyon continued his testimony. (*Id.* at 10.) He stated that the Employer had submitted checks and remittance reports to the Funds and verbally acknowledged an agreement with the Union to employ Laborers. (*Id.*) Kenyon then testified that he sent an audit notice to Buckler for July 14, 2012, requesting required documents. (*Id.*) At the July 14 audit, Kenyon accompanied the Funds' auditor, Carlos DeOlivirei, to the audit with Buckler and counsel Nicholas Khoudary. (*Id.*) However, Kenyon testified that at the audit, the requested documents were not fully provided—instead, Buckler merely provided "handwritten pages . . . and a typed payroll summary." (*Id.*) When asked by Kenyon about providing certified payrolls, Buckler responded that none existed. (*Id.*) However, Kenyon also stated that he was contacted by the New Jersey Department of Labor about Buckler's representation that he was a union contractor and paying contributions to the Funds. (*Id.*) During these conversations with the New Jersey Department of Labor, Buckler stated clearly that "[he] employed many people who are union members and those people we would pay prevailing wage . . . but [he] did not say [he] was a union contractor." (*Id.* at n.5). Buckler stated he did not remember telling the Department of Labor representative that he paid contributions to the Funds. (*Id.*) Kenyon, in his testimony, also identified pay stubs of one Jose Pereira, issued by the Employer, with Funds deductions listed. (*Id.* at 10).

      B.     The Arbitrator's Findings

Pierson ultimately found that despite Buckler's testimony that the documents containing his signature were forged, that Laborers Local 472 and the Employer were signatories to an effective CBA. (*Id.*) Pierson found that the Employer's employment of Local 472 Laborers under the terms of the CBA, their performance of work within the

7

trade jurisdiction of the Laborers, and the remittance of benefit contributions contradicted Buckler's denial of a valid CBA and his denial of having signed the CBA. (*Id*.) Pierson further found that the CBA required an employer to "contribute fringe benefit payments" under Articles 33, 34, 35, 35A, 35B, 35C, 35D, 35E, and 36 for Laborers performing work under Article 2 of the CBA. (*Id*. at 11). Moreover, Pierson concluded that the Employer had remitted such benefit contributions on behalf of members of Laborers Local 472. (*Id*.) Pierson found valid authority in the CBA, Article 33(f) for the Funds "to inspect, at all reasonable times, the employment, payroll and other such records of each Employer" to determine the accuracy and completion of benefit contributions. (*Id*.) The arbitrator further found that the Employer failed to provide payroll records requested by the Funds in order to assess such accuracy. (*Id*.)  In terms of the amount unpaid, the arbitrator concluded that, despite an initial determination by the Funds of remitted benefit contributions in the amount of $35,000, that upon retention of pay stubs by employees, the Funds reasonably relied on all available documents to determine that the Employer "under-reported fringe benefits for the period of April 5, 2010 through December 31, 2011" totaling a revised sum of $82,338.44. (*Id*.)

With respect to the Employer's participation in the auditing process, Pierson found that the Funds requested payment, and gave an opportunity to the Employer to correct any discrepancies, but when the Employer was audited, it did not provide the documents required to prepare a complete audit. (*Id*.) Pierson found, as asserted by the Funds, that the Employer "failed to provide all payroll records for the year 2010 and only provided limited information for 2011." (*Id*. at 12) Additionally, the arbitrator concluded, the Employer failed to provide the required W-30s, W-2s, and certified payrolls. (*Id*.)

And, regarding Buckler's handwritten information for 2010, Pierson deemed that data "unreliable," as he did the "Payroll Summary" for 2012 that listed only a limited numbers of workers.

Lastly, Pierson found that the revised audit of July 14, 2012 showed the Employer's liability as totaling $120,906.68 for contributions to the Funds for work performed by members of Laborers Local 472 on the Employer's job sites from April 5, 2010 through September 31, 2011. (*Id.*)

Based on these findings, Pierson awarded and ordered the following on September 29, 2012:

1. Buckler Associates [Inc.], as signatory employer, shall make the Funds whole in the principal amount of **$120,906.68**; plus collection costs, specifically: interest in the amount of **$10,290.66** on unpaid contributions; reasonable attorneys' fees in the amount of **$20,581.12**; and the Arbitrator's fee of **$5,500.00**.

2. Buckler Associates [Inc.] shall make payment to: "Heavy and General Laborers Funds of New Jersey" in the total amount of **$157,278.46**, as specifically set forth in paragraph 1 above, and forward to Counsel to the Funds . . . within fourteen (14) days.

3. This Arbitrator shall retain jurisdiction over this matter until written confirmation of compliance is received from Funds' Counsel that payment of the above amount has been received.

## II.   STANDARD OF REVIEW.

When parties to a CBA agree to settle a dispute through arbitration, the Court's review of the resulting decision of the arbitrator is "extraordinarily limited." *See Dauphin Precision Tool v. United Steelworkers of America,* 338 Fed. Appx. 219, 222 (3d Cir. 2009) (citing *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001)). "We do not review the merits of the decision or correct factual or legal errors." *Id.* (citing *Garvey,* 532 U.S. at 509; *Major League*

*Umpires Ass'n v. Am. League of Prof'l Baseball Clubs,* 357 F.3d 272, 279 (3d Cir. 2004)). Rather, this Court "must enforce an arbitration award if it is based on an arguable interpretation of the collective bargaining agreement, and we may only vacate an award if it is entirely unsupported by the record or if it reflects a 'manifest disregard' of the agreement." *Id.* at 222–23 (quoting *Exxon Shipping Co. v. Exxon Seamen's Union,* 73 F.3d 1287, 1291 (3d Cir. 1996) (quoting *News Am. Publ'ns, Inc. v. Newark Typographical Union, Local 103,* 918 F.2d 21, 24 (3d Cir. 1990)). In other words, unless the "arbitrator's decision is wholly unsupported by the agreement's plain language or the arbitrator fails to adhere to basic principles of contract construction [,]" a court is not permitted to overturn that decision. *Cacace Associates, Inc. v. Southern New Jersey Bldg. Laborers Dist. Council,* No. 3:07–cv–5955–FLW, 2009 WL 424393, *3 (D.N.J. Feb.19, 2009) (citing *News Am. Publications, Inc., Daily Racing Form Div. v. Newark Typographical Union, Local 103,* 921 F.2d 40, 41 (3d Cir. 1990); *Exxon Shipping Company v. Exxon Seamen's Union,* 801 F.Supp. 1379, 1384 (3d Cir. 1992)). This Court's obligation is to "uphold an arbitrator's judgment if the decision, on its face, was drawn from the parties' agreement or is remotely based on reasonable contractual interpretation." *Id.* (citing *United Trans. Union Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376, 379 (3d Cir. 1995).

Further, pursuant to the Federal Arbitration Act ("FAA"), a district court is permitted to vacate arbitration awards "only under exceedingly narrow circumstances." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London,* 584 F.3d 513, 557 (3d Cir. 2009) (quoting *Dluhos v. Strasberg,* 321 F.3d 365, 370 (3d Cir. 2003)). The limited circumstances in which a court may vacate an arbitration award are:

> (1) where the award was procured by corruption, fraud or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a); *see also New Jersey Carpenters Funds v. Professional Furniture Services,* No. 3:08–3690, 2009 WL 483849, *2 (D.N.J. Feb. 25, 2009) (quoting 9 U.S.C. § 10(a)).

Therefore, this Court will uphold an award "so long as it draws its essence from the [CBA]" and is not merely the arbitrator's "own brand of industrial justice." *Veeder Root Co. v. Local 6521,* 293 Fed. Appx. 924, 925 (3d Cir. 2008) (quoting *USWA v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). In other words, unless the "arbitrator's decision is wholly unsupported by the agreement's plain language or the arbitrator fails to adhere to basic principles of contract construction[,]" a court is not permitted to overturn that decision. *Cacace Associates, Inc. v. Southern New Jersey Bldg. Laborers Dist. Council,* No. 07–5955, 2009 WL 424393, *3 (D.N.J. Feb.19, 2009) (citing *News Am. Publications, Inc., Daily Racing Form Div. v. Newark Typographical Union, Local 103,* 921 F.2d 40, 41 (3d Cir. 1990); *Exxon Shipping Company v. Exxon Seamen's Union,* 801 F. Supp. 1379, 1384 (3d Cir. 1992)).

## III.  DISCUSSION

Petitioners seek confirmation of the Arbitration Award, as well as collection costs, interest on unpaid contributions, attorneys' fees, and arbitrator's fees. Rather than raising defenses to the enforcement of the Arbitration Award, Respondent objects to the

11

merits of the arbitrator's findings and ultimate decision[2]. Thus, for the reasons that follow, the Court finds that Petitioners properly proceeded before Pierson to arbitrate the parties' dispute, and upholds the Arbitrator's ruling, confirming the award.

### A. Confirmation of Award

In the instant matter, Respondent has not cited any legal basis that would warrant vacating the arbitrator's decision; Respondent has not established that the arbitration award was procured by fraud or other unfair means, was the result of corruption, that the arbitrator showed misconduct, the arbitrator exceeded his power, or was imperfect in any such way as to warrant this Court to vacate the award under the terms provided by the FAA and Circuit precedent. *See* 9 U.S.C. § 10(a); *New Jersey Carpenters Funds,* No. 3:08–3690, 2009 WL 483849, at *2. In the arbitration, Pierson found that the parties were signatories to a valid CBA based on a substantial record of evidence, including that Respondent employed union members, testimony that Respondent had previously forwarded contribution reports and submitted checks to Petitioner, Petitioner's verbal acknowledgement of the CBA, and pay stubs showing remittance. All of this evidence strongly supports the arbitrator's finding of a collective bargaining relationship. (Pet'rs' Ex. B. at p. 3, 8, 10, 11, n.5).

Moreover, the arbitrator's conclusion that the CBA mandates remittance is clearly drawn from the CBA. The CBA provides that in Article 33, the Employer is required to

---

[2] Respondent does not challenge arbitrability, and thus, this Court does not reach the merits of such a question. In this connection, the Court notes that Respondent filed, without leave of Court, a "Reply Certification" in which questions of arbitrability and other challenges to the merits of the arbitration ruling are raised. This document is effectively an unauthorized sur-reply. As sur-replies filed without leave of Court violate the District of New Jersey local rules, the Court does not consider the sur-reply in this ruling. *See* Rule 7.1(d)(6) ("No sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned.")

contribute to the Fund when it employs Laborers. (*Id*. at p. 3). Furthermore, Article 38 of the CBA provides in relevant part:

> The employer shall also be required to pay all three auditing costs in any instance where he disputes the amount claimed due to the Funds and he is re-audited, except where the re-audit shows that the Employer did not owe the Funds on the contributions for the period in question,

The Article's reference to these three audits make it clear that the arbitrator's imposition of costs was directly taken from the CBA itself. (*Id*. at 4). Based on the aforementioned facts, the admission by Respondent that it employed individuals from Laborers Local 472, and on the arbitrator's well-supported determination that the Employer had remitted such benefit contributions outlined in the CBA, I conclude that the arbitrator's decision "draws its essence" from the language of the CBA. *See United Steel Workers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960); (Pet'rs' Ex. B. at 11, n.5).

Respondent urges the Court to overturn the award, claiming that his signature was forged, and by stating flippantly that "Plaintiff is perpetrating a fraud on the Court seeking funds that are not due" because no CBA "exists between Buckler Associates, Inc. and [Petitioner]" and "the [CBA] . . . has expired" (Resp't's Opp'n Mot.). However, Petitioner's evidence of forgery—scant as it was—was submitted to the arbitrator, and it is not up to this Court to "sit as the [arbitrator] did and reexamine the evidence." *Mutual Fire, Marine, & Inland Ins. Co. v. Norad Reins. Co., Ltd.,* 868 F.2d 52, 56 (3d Cir. 1989). So long as an "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' [even] the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.' " *Eastern Associated Coal Corp. v. United Mine Workers of America, District 17,* 531 U.S. 57, 62 (2000) (quoting *Misco,* 484 U.S. at 38). In other words, it is not within the province of

13

this Court to substitute its judgment for that of an arbitrator's, however injudicious that judgment may be.  Rather, Congress' intent in passing the FAA and concurrent policy considerations guide this Court's obligation to uphold an arbitrator's judgment if the decision, on its face, was drawn from the parties' agreement or is remotely based on reasonable contractual interpretation, which the Court finds occurred here. *See United Trans. Union Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376, 379 (3d Cir.1995). Moreover, in this case, I see no basis for questioning the arbitrator's thoroughly considered opinion in which he weighed all the evidence—including that submitted by Petitioner. Accordingly, Respondent's arguments fail, and the award is confirmed in the amount established by the arbitrator: $157,278.46.

## IV.    CONCLUSION

Based on the foregoing, Petitioner's petition to confirm the arbitration award in the amount of $157,278.46 is granted. Judgment is entered against Respondent.


Dated:  January 28, 2013


　　　　　　　　　　　　　　　　　　　　　　　　　 /s/ Freda L. Wolfson
　　　　　　　　　　　　　　　　　　　　　　　　Freda L. Wolfson, U.S.D.J.